# United States Court of Appeals
## For the First Circuit

No. 22-1862

ANTHONY D. GULLUNI,
District Attorney for Hampden County, in his official capacity,

Plaintiff, Appellant,

v.

JOSHUA S. LEVY,
Acting U.S. Attorney for the District of Massachusetts,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Kayatta, Selya, and Gelpí,
Circuit Judges.

Elizabeth N. Mulvey, with whom Thomas M. Hoopes and Libby, Hoopes, Brooks & Mulvey P.C. were on brief, for appellant.
Michael Shih, Appellate Staff Attorney, with whom Brian M. Boynton, Principal Deputy Assistant Attorney General, Joshua S. Levy, Acting United States Attorney, and Daniel Tenny, Appellate Staff Attorney, were on brief, for appellee.
Matthew R. Segal, Jessica J. Lewis, Rebecca A. Jacobstein, American Civil Liberties Union Foundation of Massachusetts, Inc., and Committee for Public Counsel Services, on brief in support of neither party for Committee for Public Counsel Services and Hampden County Lawyers for Justice, amici curiae.

October 30, 2023

GELPÍ, <u>Circuit Judge</u>.    Appellant Anthony D. Gulluni ("Gulluni"), District Attorney for Hampden County, Massachusetts, challenges the district court's granting of summary judgment in favor of Appellee Joshua S. Levy, Acting United States Attorney for the District of Massachusetts.    Gulluni contends that the district court applied the incorrect standard in reviewing the denial by the United States Department of Justice ("DOJ") of his request for information related to a federal police misconduct investigation.    Because DOJ properly based its denial on privilege grounds and given the applicable standard under the Administrative Procedure Act ("APA"), we affirm the district court's decision.

## I. Background

We discuss the undisputed facts as they were presented below.[1]    In April 2018, DOJ initiated a "pattern or practice" investigation into the Springfield, Massachusetts Police Department ("SPD") pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601.[2]    After a twenty-seven-month investigation, DOJ released a public report citing specific instances of misconduct and general failures within SPD's practices.    This twenty-eight-page report, released on July 8,

---

[1] <u>See</u> <u>Quintero de Quintero</u> v. <u>Aponte-Roque</u>, 974 F.2d 226, 228 (1st Cir. 1992) (stating that when the "facts are undisputed," appellate review is "one of law").

[2] Formerly 42 U.S.C. § 14141.

2020, critically found patterns or practices of excessive force by SPD officers in violation of the Fourth Amendment. The dates of the specific instances of misconduct and the names of the persons involved were not included in the report.

Because DOJ's investigation involved the review of "more than 114,000 SPD documents," Gulluni sent DOJ a letter ("Touhy request" or "request") requesting all SPD reports and documents supporting DOJ's specific and general findings in an attempt to identify the SPD officers "who were the subject of DOJ's findings." Gulluni specifically requested:

> (1) A copy of all Springfield Police Department reports, including but not limited to incident reports, investigative reports, arrest reports, use-of-force reports, or contents of a prisoner injury file . . . determined as examples where Narcotics Bureau officers falsified reports to disguise or hide their use of force;
>
> (2) A copy of all Springfield Police Department reports, including, but not limited to incident reports, investigative reports, arrest reports, use-of-force reports, or contents of a prisoner injury file . . . determined as . . . a pattern or practice . . . [where] officers made false reports that were inconsistent with other available evidence, including video and photographs . . . [;] and
>
> (3) A copy of all photographs or video/digital material determined as inconsistent with any Springfield Police Department officers' reports, including, but not limited to incident reports, investigative reports, arrest reports, use-of-force reports, or

            contents    of    a    prisoner    injury
            file . . . (internal quotations omitted).

From Gulluni's perspective, his request was imperative given his constitutional duty, as District Attorney, to disclose exculpatory evidence to criminal defendants as per Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).

After due consideration, DOJ denied Gulluni's request in accordance with Touhy regulations,[3] asserting law enforcement and work product privileges. 28 C.F.R. §§ 16.21-16.29. DOJ further stated that the requested materials originated with SPD, which Gulluni could contact directly at any time. Gulluni then filed suit in May 2021 asserting that the denial of his Touhy request was arbitrary, capricious, an abuse of discretion, and not in accordance with law, thereby, a violation of the APA. 5 U.S.C. §§ 701-706. The parties filed cross motions for summary judgment, and the district court ruled in favor of DOJ. Gulluni v. U.S. Att'y for the Dist. of Mass., 626 F. Supp. 3d 323 (D. Mass. 2022). Gulluni timely appealed.

In April 2022, prior to the district court's decision, DOJ entered into a consent decree with SPD and the City of

---

[3] Touhy regulations, named after the Supreme Court case, United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951), guide DOJ decisions in determining whether to disclose requested information and documents. Cabral v. U.S. Dep't of Just., 587 F.3d 13, 22 (1st Cir. 2009); see infra Part II(B).

Springfield ("City"), but long after DOJ responded to the <u>Touhy</u> request. When the United States enters into a consent decree of this sort with a state or local government, the latter does not admit to the alleged violations but instead agrees to make the necessary reforms and changes to remedy such violations. <u>See United States</u> v. <u>Armour & Co.</u>, 402 U.S. 673, 676, 681-82 (1971) (stating that after entering into a consent decree: "The parties waive their right to litigate issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation."); <u>e.g.</u>, <u>Bos. Police Superior Officers Fed'n</u> v. <u>City of Boston</u>, 147 F.3d 13, 15 (1st Cir. 1998) (involving a consent decree to reform the Boston Police Department's "racial discrimination in its promotion practices"); <u>Culbreath</u> v. <u>Dukakis</u>, 630 F.2d 15, 17 (1st Cir. 1980) (concerning the Commonwealth of Massachusetts' consent decree with four state employee labor unions to remedy "racial discrimination in the hiring and promotion practices").[4]

---

[4] Foundationally, a consent decree is a legal agreement between two parties that is approved by a federal court. <u>See generally</u> <u>United States</u> v. <u>Comunidades Unidas Contra La Contaminación</u>, 204 F.3d 275 (1st Cir. 2000) (discussing consent decrees in the environmental context). Consent decrees resemble contracts due to the voluntary nature in which agreement is reached, but these decrees also "bear some of the earmarks of judgments entered after litigation." <u>Local No. 93, Int'l Ass'n of Firefighters</u> v. <u>City of Cleveland</u>, 478 U.S. 501, 519 (1986).

Since the mid-1990s, police reform consent decrees, such as that between DOJ and the City, have been filed in various jurisdictions across the nation. <u>See</u> Gustavo A. Gelpí, <u>Police Reform as Seen Through the Eyes of a District Judge</u>, <u>Fed. Law.</u>, Sept. 2016, at 58 (noting that DOJ investigations have resulted in "exponentially increased law enforcement reform nationwide"); <u>see generally</u> Alejandro del Carmen, <u>Racial Profiling in Policing: Beyond the Basics</u> 119-40 (2d ed. 2023) (explaining federal police reform consent decrees). "The most common areas reformed are usually use of excessive force, unreasonable searches and seizures, discriminatory policing, illegal detentions, and false arrests." Gelpí, <u>supra</u>, at 59. The Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601, created a pathway for the DOJ to institutionally address unconstitutional police behavior, which is significant because, before the Act, the ability to address misconduct was "limited to prosecutions of individual police officers . . . under the color of state law." del Carmen, <u>supra</u>, at 120.

## II. Discussion

On appeal, Gulluni contends that the district court erred in (1) applying the arbitrary and capricious standard found in § 706(2)(A) of the APA to its review of DOJ's denial of his <u>Touhy</u> request and (2) finding that DOJ's privilege grounds were not "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with the law." 5 U.S.C. § 706(2)(A). We review
an award of summary judgment de novo. Cabral, 587 F.3d at 23.
First, we will address the correct standard to be applied to DOJ's
decision here. Second, we will examine the merits of Gulluni's
appeal regarding the privileges that DOJ invoked.

For the reasons that follow, we conclude that the
district court applied the correct APA standard to analyze DOJ's
denial of Gulluni's Touhy request and that DOJ's invocation of the
work product and law enforcement privileges was not arbitrary and
capricious. Accordingly, we affirm on all issues.

### A. The Arbitrary and Capricious Standard

Gulluni insists that the applicable standard of review
for DOJ's denial of his Touhy request is found in
§ 706(2)(B) -- whether the agency action was "contrary to [a]
constitutional right" -- based on his characterization of his
claims as constitutional in nature under Brady and Giglio, giving
rise to de novo review. On the other hand, DOJ maintains that
§ 706(2)(A)'s deferential arbitrary and capricious standard
applies.

Generally, § 706(2)(B)'s constitutional right standard
applies to Touhy denials that encompass claims that are
substantially constitutional or constitutional in nature, whereas
§ 706(2)(A)'s arbitrary and capricious standard applies to agency
decisions that do not substantially concern constitutional issues.

- 8 -

Cases that have applied the constitutional right standard to a
Touhy request denial, as opposed to the usual arbitrary and
capricious standard, noted that such challenges to an agency's
decision materially turned upon the underlying constitutional
claim rather than merely possessing a would-be, ancillary
constitutional obligation. Compare, e.g., People for Ethical
Treatment of Prop. Owners v. U.S. Fish & Wildlife Serv., 852 F.3d
990, 996, 999-1000 (10th Cir. 2017) (applying the constitutional
right standard to a claim substantially concerned with a
constitutional taking), with Puerto Rico v. United States, 490
F.3d 50, 60-61 (1st Cir. 2007) (analyzing the FBI's decision not
to release the requested information under the arbitrary and
capricious standard because the claim was not constitutional in
nature).

We agree with the district court that, while
constitutional duties are implicated by Gulluni's role as District
Attorney, constitutional duties alone do not trigger the
application of § 706(2)(B)'s higher "contrary to constitutional
right, power, privilege, or immunity" standard. The mere fact
that disclosure would assist Gulluni in discharging his duties
under Brady and Giglio does not make his request constitutional in
nature. Gulluni's request only implicates constitutional concerns
because, in a potential criminal action with unspecified "Hampden
County state court defendants," he will be constitutionally

obligated to provide <u>Brady</u> material.  Surely, DOJ's disclosure to
Gulluni would ease compliance with his constitutional obligations,
but Gulluni's ability to comply with said obligations does not
turn on whether DOJ discloses the requested information.

Gulluni further argues that the constitutional right standard
applies because as District Attorney, he is "asserting the
constitutional right[s] of others" -- namely, Hampden County
criminal defendants.  However, he fails to meaningfully discuss
his standing to assert those constitutional rights on behalf of
others.  In fact, Gulluni only cites cases that, although the
constitutional right standard was applied to agency decision
challenges, are entirely distinguishable from his own claim.  In
each of those cases, the challengers had established standing to
assert the constitutional rights at issue, and more importantly,
the constitutional claims were substantive in nature.  <u>People for
Ethical Treatment of Prop. Owners</u>, 852 F.3d at 990; <u>Cook Cnty.</u> v.
<u>Wolf</u>, 461 F. Supp. 3d 779(N.D. Ill. 2020); <u>All. for Nat'l Health
U.S.</u> v. <u>Sebelius</u>, 714 F. Supp. 2d 48 (D.D.C. 2010).  Each party's
<u>Touhy</u> claims therein were based upon constitutional violations or
infringements that had occurred rather than on constitutional
violations that could possibly occur.  <u>People for Ethical Treatment
of Prop. Owners</u>, 852 F.3d at 996, 999-1000 (constitutional taking
occurred); <u>Wolf</u>, 461 F. Supp. 3d at 782, 797 (agency's rule
violated the "equal protection component of the Fifth Amendment's

Due Process Clause"); <u>All. for Nat'l Health U.S.</u>, 714 F. Supp. 2d
at 51-52, 59-60 (agency's health regulation violated First
Amendment commercial speech rights).  Yet, the issue of whether
Gulluni possesses standing to bring these constitutional claims is
not one we need to decide.

Here, DOJ is not prosecuting the criminal defendants
Gulluni is concerned with.  And any constitutional duty of Gulluni
to turn over documents to a defendant whom Gulluni's office
prosecutes does not give rise to a constitutional duty by DOJ to
share its views of the documents with Gulluni or anyone else, at
least where DOJ had no role in the state court prosecutions.  DOJ's
denial did not violate a constitutional right, and Gulluni's
constitutional concerns are tentative at best -- to which Gulluni
admitted as much in his brief by expressing that SPD officers may
be "potential witness[es]."  <u>See generally</u> <u>Saleh</u> v. <u>Blinken</u>, No.
22-1168, 2023 WL 5091819, at *2 (2d Cir. Aug. 9, 2023) (utilizing
the constitutional right standard for a substantially
constitutional issue rather than a potential constitutional
issue).  Further, Gulluni has other direct avenues to access the
materials, enabling him to discharge his possible constitutional
obligations to state criminal defendants, rather than requesting
those materials from a party which these did not originate from.
Suitably, the review of agency action under the arbitrary and
capricious standard applies here.

## B. DOJ's Privileges Under the Arbitrary and Capricious Standard

Before delving into DOJ's privilege invocations, it is worthwhile to briefly discuss the Housekeeping Act and Touhy regulations to properly review DOJ's decision under the arbitrary and capricious standard.  "The Housekeeping Act, 5 U.S.C. § 301, authorizes federal agencies to create rules governing discovery and disclosure." Cabral, 587 F.3d at 22 (citing Puerto Rico, 490 F.3d at 61).  These regulations were upheld by the Supreme Court: the head of an agency may appropriately "prescribe regulations not inconsistent with law for 'the custody, use, and preservation of records, papers, and property appertaining to' the Department of Justice." Touhy, 340 U.S. at 468.  These DOJ regulations, otherwise known as Touhy regulations, guide agency decisions pertaining to disclosures but do not itself provide a substantive defense to disclosure.  28 C.F.R. §§ 16.21-16.29; see Puerto Rico, 490 F.3d at 61.

Section 16.26(b) of the regulations is particularly relevant because it enumerates the factors that agencies analyze to determine whether to disclose.  28 C.F.R. § 16.26(b).  Under § 16.26(b)(5), disclosure may not be made when it "would reveal investigatory records compiled for law enforcement purposes . . . and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness

of which would thereby be impaired." 28 C.F.R. § 16.26(b)(5).
Nevertheless, because <u>Touhy</u> regulations are procedural in nature,
"our review of the reasonableness of the agency's decision focuses
on the substantive law concerning privilege" and is limited to
"the administrative record already in existence." <u>Puerto Rico</u>,
490 F.3d at 61-62; <u>Camp</u> v. <u>Pitts</u>, 411 U.S. 138, 142 (1973) (per
curiam); <u>see</u> 5 U.S.C. § 702 (providing unsuccessful solicitants
with a pathway to judicial review).

DOJ's denial of Gulluni's <u>Touhy</u> request will be
overturned only if the decision was "arbitrary, capricious, an
abuse of discretion, or otherwise not in accordance with the law."
5 U.S.C. § 706(2)(A). An agency's decision is arbitrary and
capricious if the agency relied on improper factors, disregarded
"an important aspect of the problem, offered an explanation that
runs counter to the evidence," or when a reasonable explanation
for the agency's decision cannot be discerned. <u>Motor Vehicle Ass'n</u>
v. <u>State Farm Mut. Auto. Ins.</u>, 463 U.S. 29, 43 (1983); <u>Judulang</u> v.
<u>Holder</u>, 565 U.S. 42, 64 (2011); <u>Balt. Gas & Elec. Co.</u> v. <u>Nat. Res.</u>
<u>Def. Council, Inc.</u>, 462 U.S. 87, 105 (1983). In accordance with
this "narrow standard of review," a court "is not to substitute
its judgment for that of the agency" but rather determine "whether
there has been a clear error of judgment." <u>Fed. Commc'ns Comm'n</u>
v. <u>Fox Television Stations, Inc.</u>, 556 U.S. 502, 513 (2009);
<u>Citizens to Pres. Overton Park, Inc</u>. v. <u>Volpe</u>, 401 U.S. 402, 416

(1971), abrogated on other grounds by Califano v. Sanders, 430
U.S. 99 (1977)); Judulang, 565 U.S. at 64 (instructing that the
agency's decision should be connected to the purpose and concerns
of relevant law). Agencies maintain "expertise and
experience . . . that no court can properly ignore." Judulang,
565 U.S. at 53. In this light, "[w]e apply the same deferential
standard to the agency's decision as the district court." Cabral,
587 F.3d at 23; Puerto Rico, 490 F.3d at 61.

## 1. Work Product Privilege

The work product privilege, recognized by the Supreme
Court in Hickman v. Taylor, is codified in the Federal Rules of
Civil Procedure. 329 U.S. 495 (1947); Fed. R. Civ. P. 26(b)(3).
This doctrine aims to provide an attorney with "a zone of privacy
within which to prepare the client's case and plan strategy without
undue interference" and "act to some degree as a brake on the
court's power." In re San Juan Dupont Plaza Hotel Fire Litig.,
859 F.2d 1007, 1013-14 (1st Cir. 1988). Although this doctrine
was developed in the realm of civil discovery, it has been found
to apply in other circumstances. See, e.g., Upjohn Co. v. United
States, 449 U.S. 383, 397-402 (1981) (Internal Revenue summonses);
United States v. Nobles, 422 U.S. 225, 236 (1975) (criminal
matters). The crux of the matter being that "[o]ur adversarial
system of justice cannot function" without this doctrine. In re
San Juan, 859 F.2d at 1014. More to the point, this court has

recognized that the sorting and segregation of documents in anticipation of litigation is protected by ordinary work product privilege as this "provides insight into opposing counsel's understanding of his case." Id. at 1018-19. However, there are limits to the scope of this privilege upon a showing of a substantial need and undue hardship. Fed. R. Civ. P. 26(b)(3)(A)(ii).

Gulluni argues that the work product privilege is so "egregiously wrong" as invoked by DOJ given it has failed to provide a "specific analysis" or a "satisfactory explanation for its refusal" to disclose. We have stated that the selection of documents may reveal opposing counsel's mental impressions. In re San Juan, 859 F.2d at 1018-19. Here, rather than ask for all of SPD's documents, Gulluni asked DOJ to only divulge exactly which documents were selected and relied upon in its report, specifically DOJ's assessment of SPD's documents, which we determine is safeguarded by the work product doctrine. Id. at 1018. DOJ reasonably explained in its October 21, 2020, letter that the documents sought "reflect[ed] the thoughts and impressions of DOJ attorneys, paralegals, and investigators." This letter also explained why the information sought by Gulluni is privileged under its guidelines: such "disclosures would reveal the internal deliberation process within the Department of Justice." Puerto Rico, 490 F.3d at 73 (Boudin, C.J., concurring) (looking to the

- 15 -

agency's application of "its [own] general policy" to determine whether the agency's decision was arbitrary and capricious). This reasoning is merited under our own precedent concerning ordinary work product privilege as the sorting of documents may allow inappropriate insight into an agency's investigation. In re San Juan, 859 F.2d at 1018. And while DOJ's reasoning may not satisfy Gulluni's own benchmark for a "satisfactory explanation," we determine that DOJ's decision and assessment in denying Gulluni's request was reasonably explained, which is all that DOJ is required to do.

In addition, Gulluni argues that the SPD documents were not protected by the work product doctrine because the materials were not prepared in anticipation of litigation and were produced in SPD's ordinary course of business. As we have explained, Gulluni did not merely seek SPD documents as they plainly were but sought to specifically obtain DOJ's "determinations" of SPD's misconduct, which is covered by the work product doctrine. DOJ's selection and determination of SPD's unconstitutional patterns or practices was effectuated to correct such constitutional deprivations in which remedy would have occurred through either litigation or a consent decree. Therefore, it cannot be said that DOJ was unreasonable in its conclusion that its selection and determination process of SPD documents was done in anticipation of an enforcement proceeding against SPD and the City. Maine v. U.S.

<u>Dep't of Interior</u>, 298 F.3d 60, 68 (1st Cir. 2002) (concluding
that the work product privilege does not only include documents
prepared "primarily" or "exclusively" for litigation but also
documents prepared because of "expected litigation" even if the
"purpose is not to assist in litigation") (internal quotations
omitted).  And even though the potential litigation would have
been only between DOJ and SPD, disclosure to a third party, such
as Gulluni, who could then access privileged information, could
have waived DOJ's work product protections and impaired its
negotiation leverage against SPD.  See <u>United States</u> v. <u>Mass. Inst.
of Tech.</u>, 129 F.3d 681, 687 (1st Cir. 1997) (highlighting that
preventing disclosure to third parties who may disclose such
materials to an adversary preserves the work product privilege).

        Gulluni further argues that DOJ waived any work product
privilege by releasing its public report.  Gulluni cited several
cases to support his position, yet each miss the mark.[5]  DOJ's act
of publishing the findings report was not inconsistent with the

_____

        [5] <u>In re Zofran (Ondansetron) Prods. Liab. Litig.</u>, 392 F. Supp.
3d 179 (D. Mass. 2019) (documents were fully disclosed to the
public thereby waiving work product privilege); <u>Koninklijke
Philips Elecs. N.V.</u> v. <u>ZOLL Med. Corp.</u>, No. 10-11041-NMG, 2013 WL
812484 (D. Mass. Mar. 4, 2013), at *2-3 (the information sought
were facts and technical information not subject to work product
protection); <u>United States</u> v. <u>Joint Active Sys., Inc.</u>, No. 19-mc-
91053-ADB, 2020 WL 9747574, at *5 (D. Mass. Apr. 28, 2020)
(attorney-client privilege, not work product privilege, was at
issue); <u>In re Atl. Fin. Mgmt. Sec. Litig.</u>, 121 F.R.D. 141 (D. Mass.
1988) (already-discovered documents could be used to refresh a
witness without violating work product privilege).

purpose of the work product doctrine; instead, it put the public on notice of what was discovered during DOJ's investigation into SPD -- an investigation that revealed SPD's many alleged constitutional violations. The publication of the findings report was simply the first step in DOJ's process of entering into negotiations with SPD. And as DOJ asserts, when the findings report was published, it was not clear whether SPD would be willing to enter into a consent decree or if litigation would have ensued. Upon review, it is transparent that the published findings report did not disclose the underlying SPD documents to anyone nor DOJ's thought processes. <u>Mass. Inst. of Tech.</u>, 129 F.3d at 687 (highlighting that "disclosing material in a way inconsistent with keeping it from an adversary waives work product protection"). DOJ's effort to keep its analysis private is further evidenced by its intentional omission of names, dates, and specific facts underpinning its conclusions. Accordingly, DOJ's invocation of the work product privilege in denying Gulluni's <u>Touhy</u> request was reasonable. <u>See</u> <u>Cabral</u>, 587 F.3d at 23 (finding that denials of <u>Touhy</u> requests are not arbitrary and capricious when such denials are reasonable).

Gulluni also posits that any work product privilege is now mooted by the consent decree. Assuming but not deciding that that must be so, the fact remains that our review of the agency's decision must be "based on the reasons [the agency] gave when it

acted," Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1909 (2020), and therefore by implication on the information available to the agency when it made its final decision. And when DOJ denied Gulluni's Touhy request, there was no consent decree. It was thus entirely reasonable for DOJ to have considered its analysis of the SPD documents to be in anticipation of possible litigation and invoke the work product privilege accordingly.

Gulluni finally contends that his "legal and ethical obligation to disclose exculpatory material to [criminal] defendants" shows a "substantial need" for the materials. But Gulluni already has access to all the underlying documents on which DOJ relied in compiling its report. What he is really seeking are DOJ's impressions and thought processes regarding those documents. And Gulluni has not demonstrated that his Brady or Giglio obligations extend to DOJ's own thoughts as to the contents of the documents.

As the district court reasoned under the deferential arbitrary and capricious standard, DOJ has made no clear error. Thus, DOJ's determinations concerning work product privilege were not arbitrary, capricious, or without reason, as required to overcome our deference to DOJ's decision.

## 2. Law Enforcement Privilege

Following the Supreme Court's recognition of a law
enforcement privilege in <u>Roviaro</u> v. <u>United States</u>, 353 U.S. 53
(1957), we have recognized a privilege for law enforcement
activities regarding "confidential government surveillance
information" to "confidential informant[s]" to "law enforcement
techniques and procedures." <u>United States</u> v. <u>Cintolo</u>, 818 F.2d
980, 1002 (1st Cir. 1987); <u>United States</u> v. <u>Perez</u>, 299 F.3d 1, 4
(1st Cir. 2002); <u>Puerto Rico</u>, 490 F.3d at 64. The underlying
rationale being that law enforcement functions and operations will
not be effective if interference is prevalent. <u>Roviaro</u>, 353 U.S.
at 59 (explaining that there is a "public interest in effective
law enforcement"); <u>Puerto Rico</u>, 490 F.3d at 62-63; <u>Perez</u>, 299 F.3d
at 3-4 (acknowledging that the law enforcement privilege "serves
important ends"). Having recognized that the law enforcement
privilege is not absolute, it may be overcome by a sufficient
showing of authentic necessity that courts determine on a
case-by-case basis. <u>Cintolo</u>, 818 F.2d at 1002; <u>Puerto Rico</u>, 490
F.3d at 64 (clarifying that courts must balance the interests
between preserving law enforcement techniques and the need for
disclosure). Balancing the interests between the federal and state
governments "must be done with particular care." <u>Puerto Rico</u>, 490
F.3d at 64. "The interest of the party seeking disclosure tends
to be strongest when the information in question is highly

relevant, helpful, and unavailable from other sources." Ass'n for Reduction of Violence v. Hall, 734 F.2d 63, 66 (1st Cir. 1984).

In his brief, Gulluni stated that the information sought was comprised of merely "factual statements authored by the SPD" to which the privilege does not apply.[6]  Although we have not considered whether factual statements are relevant in determining if the law enforcement privilege applies, we need not decide that to resolve Gulluni's contention.  Gulluni had direct access to all of the SPD documents.  What he wants is DOJ's thoughts about those documents.  So, this is hardly a request for "factual statements authored by the SPD."

DOJ's denial of Gulluni's Touhy request was reasonable because, even though Gulluni's request was not aimed at specific techniques or procedures in the traditional sense, there was an ongoing enforcement proceeding and negotiations with SPD at the time that Gulluni made his Touhy request.  DOJ explicitly stated in its October 21, 2020, denial letter that "disclosure of the requested materials would reveal records compiled for investigative purposes and would interfere with these ongoing law

---

[6] Gulluni cited several cases in which courts have held that certain factors are to be considered in determining whether the privilege applies.  See, e.g., In re U.S. Dep't of Homeland Sec., 459 F.3d 565 (5th Cir. 2006); In re Anthem, Inc. Data Breach Litig., 236 F. Supp. 3d 150 (D.D.C. 2017).  See Puerto Rico, 490 F.3d at 62-64, for a meaningful discussion of the law enforcement privilege as utilized by sibling circuits.

enforcement proceedings."  Therefore, even though Gulluni did not
directly seek disclosure of a particular technique or procedure,
the disclosure of DOJ's law enforcement techniques and procedures
were significantly enmeshed because the specific materials
requested were the underpinnings to the report and consent decree.
Gulluni, 626 F. Supp. 3d at 330.  Disclosure of those specific
materials could have undermined DOJ's negotiation strategies
because Gulluni was seeking the fruit of DOJ's investigative
techniques and procedures.  And we find the district court's
rationale, which is in alignment with the justification underlying
the law enforcement privilege, cogent: that "disclosure might
decrease the willingness of local police departments to share
records with DOJ in the future." Gulluni, 626 F. Supp. 3d at 330-
31.

        Therefore, we conclude that DOJ's denial was not
arbitrary and capricious given its reasoned consideration of
Gulluni's request compared to its own legitimate interest in
safeguarding its determinations.[7]

### III. Conclusion

        After review, we conclude that the district court did
not err in applying the arbitrary and capricious standard and that

---

[7] Nothing in this opinion suggests that DOJ would not have to
respond in litigation to routine discovery requests requiring a
party to disclose "an opinion or contention that relates to fact
or the application of law to fact."  Fed. R. Civ. P. 33(a)(2).

DOJ's decision to deny the <u>Touhy</u> request was not arbitrary and capricious.  Thus, the judgment of the district court is **<u>affirmed</u>**.